IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

*******

MITCHELL REINHARDT,                               CV 10-27-H-CCL

       Petitioner,

-v-                                                              OPINION & ORDER

BURLINGTON NORTHERN
SANTA FE RAILROAD,

       Respondent.

*******

    This matter was removed to federal court by Respondent Burlington

Northern Santa Fe Railroad ("BNSF").  In presiding over the case, this Court sits

in diversity jurisdiction.  *See BNSF Railway. Co. v. O'Dea*, 572 F.3d 785 (9th Cir.

2009), *cert. denied*, 130 S. Ct. 1099 (2011).

    The petition for review was filed by Petitioner Mitchell Reinhardt

1

("Reinhardt") pursuant to the Montana Administrative Procedure Act, § 2-4-701, *et seq.*, Montana Code Annotated. Reinhardt seeks judicial review of a final agency decision of the Montana Human Rights Commission ("MHRC"). The final decision of the MHRC affirmed its Hearing Officer's determination that BNSF did not discriminate against Reinhardt when it terminated Reinhardt's employment for a legitimate reason.

The petition for review came on for hearing on September 21, 2011. Respondent BNSF was represented at the hearing by its counsel, Michelle T. Friend. Due to a scheduling error, no appearance was made for Respondent Reinhardt by his counsel, Peter Michael Meloy. The Court heard argument from counsel for BNSF and took the matter under advisement. Having carefully considered both the oral and written arguments of counsel, as well as the full administrative record, this Court is prepared to rule.

STANDARDS

Under Montana law "[t]he review must be conducted by the court without a jury and must be confined to the record." Mont. Code Ann. § 2-4-704(1). "The

court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact," and if additional evidence is needed, the Court must remand to the agency for that purpose.  Mont. Code Ann. § 2-4-703.  The Court may affirm, reverse, or remand the case for further proceedings.

"The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because:

(a) the administrative findings, inferences, conclusions, or decisions are:

> (I)    in violation of constitutional or statutory provisions;
>
> (ii)   in excess of the statutory authority of the agency;
>
> (iii)  made upon unlawful procedure;
>
> (iv)   affected by other error of law
>
> (v)    clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;
>
> (vi)   arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion...."

Mont. Code Ann. § 2-4-704(2).

3

In this case, the facts were adequately stated by the hearing officer in his final decision dated November 24, 2009, and are not in dispute. After passing a physical exam and after working for BNSF for approximately nine weeks, Reinhardt was terminated from his position of conductor trainee by Glendive Trainmaster Kautzmann on November 10, 2006. BNSF asserts that Reinhardt was terminated because of safety concerns. Reinhardt asserts that he was terminated due to a "regarded as" disability[1] and his age.

Reinhardt bases his claim of discrimination upon Mont. Code Ann. § 49-2-303(1)(a). That provision states that "[i]t is an unlawful discriminatory practice for . . . an employer to refuse employment to a person, or bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of . . . age [or] physical . . . disability . . . when the reasonable demands of the position do not require an age

_____

[1] "Physical disability" is defined to include either a "physical . . . impairment that substantially limits one or more of a person's major life activities" or "a condition *regarded as* such an impairment." MCA 49-2-102(19) (emphasis added).

[or] physical . . . disability . . . distinction."  MCA 492-303(1)(a).  Significantly, "[d]iscrimination based on, because of, on the basis of, or on the grounds of physical or mental disability includes the failure to make reasonable accommodations that are required by an otherwise qualified person who has a physical or mental disability."  MCA 49-2-102(19).

The Hearing Officer found that the Glendive Trainmaster, Don Kautzmann, had reported both orally and in writing that Reinhardt had been described as though he'd had a stroke and was too old (age 48) for the position of conductor trainee.  (Doc. 26-1, ¶ 32.)  Reinhardt's training coordinator, Daniel Dassinger told Reinhardt that "maybe he was too old for the job."  (¶ 34.)

In railroading, there is a practice of using union employees (craft instructors) to train new hires, "requiring management to rely to a greater extent upon the feedback of the seasoned union employees who train and observe the trainees." (¶ 13.)  Although there were some 23 good evaluations of Reinhardt's performance (all of which were lost, apparently, and could not be produced by BNSF) (¶ 37, fn.2), there were the following evaluation comments submitted by

5

other engineers, conductors, and switchmen suggesting that Reinhardt might be physically impaired:

1.  Locomotive Engineer Allen Koncilya worked with Reinhardt on an assignment, and he observed that Reinhardt was not "walking stable." (¶ 22.)  He reported his concern to Trainmaster Kautzmann out of concern about Reinhardt's mobility and safety.

2.  Conductor Keith Clingingsmith evaluated Reinhardt as good or fair in most categories, but he reported also that Reinhardt was not "walking stable." (¶ 20.)  Clingingsmith compared Reinhardt to "somebody that had a stroke or had recovered from a stroke[.]" (¶41, fn.3.) (TR 296:23-25.)

3.  Engineer Pete Score "observed Reinhardt having inordinate difficulty walking and keep his balance while on ballast and getting on and off the locomotive."  (¶ 24.)

4.  Conductor Jim Knoll worked in the switch yard with Reinhardt for several days and gave a good/fair evaluation for much of Reinhardt's work but a poor evaluation for ten specific duties.  (¶ 28.)  Knoll wrote a note on the

6

evaluation form stating that Reinhardt "does not have the physical capability to do the job [and] seems very unstable walking along the tracks and . . . on moving equipment."  (¶ 29.)

5.  After several days of observing Reinhardt in the switch yard,[2] Switch Foreman Steve Ballentine observed that Reinhardt had difficulty walking on ballast.  (¶ 30.)  Ballentine's written evaluation was dated four days after Reinhardt's termination.  (¶ 30.)

6.  On November 6, 2006, Don Dassinger (the head trainer) told Reinhardt that there were complaints about his work and "maybe he was too old for the job." (¶ 34.)  Dassinger told both H.R. Officer Woodard and Trainmaster Kautzmann that there were 30-40 good evaluations, but later Dassinger acknowledged that

---

[2]   After initial concerns were raised by the craft instructors, management placed Reinhardt in the switch yard, which apparently involves even more taxing physical duty in that switch yard duty called for twelve hour shifts consisting mostly of climbing in and out of rail cars with few opportunities to sit down.  TR 74:9-25.  Apparently the benefit to this was that Reinhardt could be observed more closely while performing switch yard duty, although it was a duty not assigned to others in his class of trainees.  TR 73:17-25.

was an overstatement and there could not have been more than 23 good evaluations.   BNSF lost the good evaluations, which were therefore not produced in discovery. (¶ 36, fn.2.)

    7.  On November 7, 2006, Reinhardt was assigned to an over-and-back run with Conductor Jason Ackerman.  Ackerman prepared and submitted a bad evaluation of Reinhardt after Reinhardt had been terminated.  (¶ 35 n.1.)

    8.  Trainmaster Kautzmann told BNSF's Human Resources Officer, Mike Woodard, that Reinhardt looked like he had had a stroke and was too old for the position.  (¶ 32.)   On November 10, 2006, Kautzmann and Dassinger met with Reinhardt, and Kautzmann told Reinhardt that "BNSF had concerns about his physical capacity to perform his job duties and that for safety's sake they were terminating his employment."  (¶ 38.)

    The Hearing Officer found that, after being terminated, Reinhardt sought medical evaluation regarding his legs.  "The evidence adduced regarding post termination medical evaluations and treatment of Reinhardt does not support any findings that Reinhardt suffered from any defined medical problem that caused his

difficulties safely performing the required physical activities necessitated by essential conductor job duties."  (¶ 44.)

The Hearing Officer's findings of fact noted in paragraph 1-8 above, are clearly not "stray remarks in the workplace," discriminatory "statements by nondecisionmakers, or statements by decisionmakers but unrelated to the decisional process." *Price-Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring).  No one in BNSF's employ suggested that Reinhardt was lazy, uninformed, or inadequately motivated to perform his job properly.[3]  The evidence clearly shows that BNSF personnel judged Reinhardt to be physically incapable and possibly too old to perform his job adequately or safely, and for these reasons his employment was terminated.  To the extent that there appears to be a dispute between the parties as to the reason for the adverse employment action, that appearance is superficial and not substantive.  Both parties agree that BNSF terminated Reinhardt because it believed Reinhardt to have a physical impairment

_____

[3]  In fact, Reinhardt passed his first two weeks of BNSF classroom training in Glendive with a test score of 92.4 and his overall BNSF classroom training with an 85%.  CP Ex. 9.

that gave rise to a safety issue.  Reinhardt merely disagrees with BNSF's conclusion that Reinhardt's physical impairment gave rise to a safety issue. Reinhardt also takes the position that the process by which BNSF came to that conclusion was defective.  However, Reinhardt does not believe that BNSF's stated reason for the termination was a pretext for something else.  In fact, the safety reason given by BNSF is not legally distinguishable from the physical impairment giving rise to the safety issue.  Conduct–including the safety and performance issues raised by BNSF--that occurs as a result of a disability (*i.e.*, "disability-produced conduct") is part of the disability itself.  It does not provide an analytically separate basis for termination.  *Gambini v. Total Renal Care*, 486 F.3d 1087, 1093 (9th Cir. 2007); *Reeves v. Dairy Queen, Inc.*, 992 P.2d 229 (Mont 1998).  Thus, there is no substantial dispute between the parties regarding the reason for the termination.  Both parties agree that BNSF terminated Reinhardt because it believed that his physical impairment gave rise to safety and performance issues.  The dispute is whether the termination for that reason was illegal.

10

The hearing officer applied the *McDonnell Douglas* standard (suitable for a "pretext" case) to Reinhardt's claim of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  It was thus Reinhardt's burden to prove that (1) he was a member of a protected class; (2) he was qualified for the conductor trainee position; and (3) he was discharged because he was a member of the protected class or classes.  *Tonack v. Montana Bank of Billings*, 854 P.2d 326 (Mont. 1993).  But first, before engaging in that analysis, the hearing officer considered whether Reinhardt's evidence was *direct* evidence of discrimination.

Quoting *Black's Law Dictionary*, 413 (5th Ed. 1979), the Hearing Officer defined direct evidence to be "'proof which speaks directly to the issue, requiring no support by other evidence' and which proves a fact or facts without the need for an inference or a presumption." (Doc. 26-1 at 12.).  If the petitioner presents direct evidence of discrimination, the burden of proof and the burden of persuasion shifts to the respondent who then must either discredit the evidence or present a legal justification for the adverse action.  (Doc. 26-1 at 12, *citing Blalock v. M.T.I.* 775 F.2d 703, 707 (6th Cir. 1985).  Significantly, the direct evidence can

11

relate solely to the adverse action or it can relate to the discriminatory intent behind the adverse action.  (Doc. 26-1 at 12-13 (*citing Foxman v. MIADS,* (6/29/1992) HRC Case #8901003997; *Edwards v. Western Energy*, (9/8/1990), HRC Case #AHpE86-2885; *Elliot v. Helena*, (6/14/1989), HRC Case #8701003108).  These two categories are significant, especially because the Hearing Officer considered the latter category, but not the former.

Although the Hearing Officer acknowledged that there were numerous instances of direct evidence wherein both fellow conductors and management personnel discussed their perceptions of Reinhardt's physical limitations and age as being the cause for Reinhardt's unacceptable job performance, the Hearing Officer nonetheless concluded that these instances reflected no "retaliatory animus that stems from stereotypical thinking...." (Doc 26-1 at 13.)  Furthermore, the Hearing Officer found that no BNSF employee "lied about or misperceived about [sic] what he saw...."  (Doc. 26-1 at 14.)  Therefore, the Hearing Officer concluded that "the descriptions of Reinhardt's difficulties in terms of age and a possible medical condition were not direct evidence of discrimination."  (Doc 26-1 at 14.)

12

This legal conclusion (that Reinhardt's evidence is not direct evidence) is flawed, however, because it ignores the other type of direct evidence:  that which relates solely to the adverse action itself.

An example of this latter category of direct evidence would be when an employer states explicitly that it is terminating an employee because of his age or physical disability:  this would be direct evidence of discrimination.  To jump to the conclusion that it is not direct evidence because the "real" reason for the adverse action is safety and poor performance, not discrimination, quits the analysis too early by ignoring the subsequent steps of the direct-evidence analysis.

The *McDonnell Douglas* burden-shifting test, which was utilized by the Hearing Officer in this case, does not apply to cases based on direct evidence of employment discrimination.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 621-22, 83 L.Ed.2d 523 (1985).  In direct evidence cases in which both parties agree on the employer's articulated reason for terminating the plaintiff, the only issue to be decided is whether the employer's action is illegal.

13

In response to a direct evidence claim wherein the reason given by the employer is not in dispute, the employer may prove by a preponderance of the evidence either (1) that plaintiff's direct evidence is simply not credible, or (2) that no unlawful motive played a role in the adverse employment action.  *See Allison v. Town of Clyde Park*, 11 P.3d 544, 547 (Mont. 2000) (citing *Reeves v. Dairy Queen, Inc.*, 953 P.2d 703 (Mont. 1998)); *see also* Rule 24.9.610(5), Admin.  R. Mont. ("ARM").  In proving its case, the employer may rely on Mont. Code Ann. § 49-2-303(a), to defend itself by proving that the reasonable demands of the position do require an age or physical disability distinction.  Additionally, the employer may defend with Mont. Code Ann. § 49-2-102(19)(b), which provides that "[a]n accommodation that would require an undue hardship or that would endanger the health or safety of any person is not a reasonable accommodation."

However, in attempting to meet its burden, the employer would also have to confront additional potential challenges arising from Montana case law and Montana's administrative rules.  One such hurdle would be the Montana's mandatory requirement that employers engage in an interactive process with an

14

employee with a disability in order to identify and implement appropriate

reasonable accommodations.  *See McDonald v. Dept. Envtl. Quality*, 214 P.3d

749, 764 fn.9 (Mont. 2009) (citing both *Barnett v. U.S. Air*, 228 F.3d 1105, 1111-

14 (9th Cir. 2000) (en banc),  *judgment vacated on other grounds*, 535 U.S. 391,

122 S. Ct. 1516, 152 L.Ed.2d 589 (2002)*, and also 29 C.F.R. § 1630.2(o)(3),[4] app.

_____

[4]"To determine the appropriate reasonable accommodation it may be
necessary for the covered entity to initiate an informal, interactive process with the
individual with a disability in need of the accommodation.  This process should
identify the precise limitations resulting from the disability and potential
reasonable accommodations that could overcome those limitations."  C.F.R.
§ 1630.2(o)(3).
    Furthermore, when a "direct threat" of substantial harm to the health or
safety is being considered, there shall be an "individualized assessment of the
individual's present ability to safely perform the essential functions of the job.
This assessment shall be based on a reasonable medical judgment that relies on the
most current medical knowledge and/or on the best available objective evidence.
In determining whether an individual would pose a direct threat, the factors to be
considered include:
    (1) The duration of the risk;
    (2) The nature and severity of the potential harm;
    (3) The likelihood that the potential harm will occur; and
    (4) The imminence of the potential harm."
C.F.R. § 1630.2(r).
    "Such consideration must rely on objective, factual evidence–not on
subjective perceptions, irrational fears, patronizing attitudes, or stereotypes–about
the nature or effect of a particular disability, or of disability generally."  C.F.R.

§ 1630.9).  Another hurdle is that when an employee is not informed until the point of termination that his disability is in issue and could potentially result in termination, the employer has a duty to investigate what reasonable accommodations might be available to assist the employee before firing the employee.  *Reeves v. Dairy Queen, Inc.*, 953 P.2d 703, 711 (9th Cir. 1998) (duty to investigate accommodation shifting to employer when employee not given opportunity to request accommodation.).  *Reeves* provides that the duty to investigate potential available accommodations arises *prior* to termination:

> [I]ndependent assessment of the risk of substantial harm is evaluation by the employer of the probability and severity of potential injury in the circumstances, taking into account all relevant information regarding the work and medical history of the person with the disability *before* taking the adverse employment action in question.

*Reeves* (quoting Rule 24.9.606(8), ARM) (emphasis added); *see also Hafner v. Conoco, Inc.*, 977 P.2d 330 (Mont. 1999) (stating that the independent assessment

---

§ 1630, app. § 1630.2(r).
    "The obligation to make reasonable accommodation is a form of non-discrimination.  It applies to all employment decisions and to the job application process."  C.F.R. § 1630, app. § 1630.9.

requirement applies to both *McDonnell* or *Reeves* tests).  The safety defense, in

particular, specifically requires that the employer independently assess whether an

accommodation would create a reasonable probability of substantial harm.  Rule

24.9.606(7), ARM.  If the employer fails to make that independent assessment,

however, then a disputable presumption arises that the employer's justification (of

safety) is a pretext for discrimination on the basis of disability.  Rule 24.9.606(7),

ARM.[5]

Clearly, an employer may have a legitimate reason for a termination (or

another adverse employment action) which might, at least superficially, appear to

be an act of discrimination.  Indeed, the Administrative Rules of Montana

explicitly make it clear that employers are not required to accommodate any and

all disabilities regardless of the hardship to the employer:

---

[5] "If an employer defends an adverse employment action against a person
with a physical or mental disability on the grounds that an accommodation would
endanger the health or safety of a person, the employer's failure to independently
assess whether the accommodation would create a reasonable probability of
substantial harm will create a disputable presumption that the employer's
justification is a pretext for discrimination on the basis of disability."  Rule
24.9.606(7), ARM.

17

(1)  It is an unlawful discriminatory practice for an employer, agent of an

employer, employment agency or labor organization to:

> (a) fail to make reasonable accommodations to the known physical or
>
> mental limitations of an otherwise qualified employee, employment
>
> applicant or union member with a physical or mental disability *unless*
>
> *it can demonstrate that the accommodation would impose an undue*
>
> *hardship on the operation of the business in question*.

Rule 24.9.606, ARM (emphasis added).

In this case, the legal justification for BNSF's adverse employment action is

that Reinhardt's termination was necessary to protect Reinhardt's safety and the

safety of others.  Indeed, such a justification is explicitly approved by the

Administrative Rules of Montana:

> An accommodation to a person with a physical or mental disability
> for the purpose of enabling the person to perform the essential
> functions of an employment position *is not reasonable if it would*
> *endanger the health or safety of any person*.

Rule 24.9.606(6), ARM.

18

It is clear to the Court that Reinhardt has presented a *prima facie* direct-evidence case of discrimination based on a perceived physical disability.  The direct evidence as to age discrimination is not as abundant.  On the other hand, it is also clear that BNSF, which commendably places high prioritization on safety, does assert the safety defense and that there is strong evidentiary support therefor.

This Court does not determine herein that BNSF's termination of Reinhardt was illegal.  Instead, the Court determines that the Hearing Officer's legal analysis was not correct and should be revisited.  The error in the analysis lies in its failure to recognize properly the nature of the direct evidence and to apply an appropriate analysis to the undisputed facts.

Therefore, finding that the final decision is affected by an error of law that substantially affects the rights of the appellant, this Court reverses the final agency decision and remands the case to the Montana Human Rights Commission for further analysis of Reinhardt's direct evidence and BNSF's defenses thereto.

Accordingly, the Petition for Judicial Review having been granted,

IT IS HEREBY ORDERED that the final agency decision of the Montana

Human Rights Commission is REVERSED and REMANDED for further proceedings consistent with this Opinion.

IT IS FURTHER ORDERED that Respondent BNSF shall pay reasonable attorney fees and costs for this suit to Petitioner's counsel, who shall submit a bill of costs and fees to opposing counsel forthwith. If counsel are unable to agree upon amount and payment details within 10 days hereafter, Petitioner shall move the Court for an order setting such fee and payment thereof.

Done and dated this 6th day of February, 2012.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE